Michael E. SPIESS et al., Plaintiffs,

v.

C. ITOH & CO. (AMERICA),
INC., Defendant.

Civ. A. No. 75-H-267.

United States District Court,
S. D. Texas,
Houston Division.

Memorandum and Opinion March 1, 1979.

On Motion to Amend Judgment and for
Certification for Immediate Appeal
April 10, 1979.

See also 408 F.Supp. 916.

Charles E. Humphrey, Jr., Edward John O'Neill, Jr., Foreman, Dyess, Prewett, Rosenberg & Henderson, Houston, Tex., for plaintiffs.

Neil Martin, Joe P. Martin, Nancy Morrison O'Connor, Fulbright & Jaworski, Houston, Tex., for defendant.

## MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

### I. Introduction

Plaintiffs, non-Japanese employees of defendant, have filed suit against defendant pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e (1974), and 42 U.S.C.A. § 1981 (1970), alleging racially discriminatory employment practices. Defendant C. Itoh & Co. (America), hereinafter "Itoh-America," is a domestic corporation incorporated under the laws of New York and a wholly-owned subsidiary of C. Itoh & Co., Ltd., of Japan, hereinafter "Itoh-Japan," a Japanese corporation which is not a party to the instant suit. Presently before the Court for consideration is Itoh-America's Rule 12(b) motion to dismiss for failure to state a claim upon which relief may be granted. The issue presented is a novel question of first impression: Does the 1953 Treaty of Friendship, Commerce and Navigation between the United States and Japan provide American subsidiaries of Japanese corporations with the absolute right to hire managerial, professional and other specialized personnel of their choice, irrespective of American law proscribing racial discrimination in employment? Consideration of the terms of the Treaty, its legislative history and relevant judicial precedent leads the Court to the conclusion that the Treaty conveys no such absolute right to Itoh-America, and that the motion to dismiss should be denied.

Simply stated, Itoh-America's argument is that it has an absolute right to hire personnel of its choice derived from the interaction of Articles I, VII and VIII of the Treaty. According to Itoh-America, Article VII authorizes Japanese corporations to organize American branches, affiliates and subsidiaries; Article VIII authorizes Japanese corporations to staff branches, affiliates and subsidiaries organized pursuant to Article VII with Japanese managerial, professional and other specialized personnel of its choice; and Article I authorizes and facilitates the entry of Japanese managerial personnel into the United States to staff branch offices and subsidiaries.

Plaintiffs' response to this argument is manifold. They contend: (1) that pursuant to the Treaty's own definitional terms Article VIII(1), the key section of the Treaty for purposes of the instant motion, does not

apply to Itoh-America, an American subsidiary of a Japanese corporation; (2) that any immunity from Title VII provided by Article VIII(1) applies only to Itoh-Japan, and that Itoh-America lacks standing to raise Itoh-Japan's rights; (3) that even if Itoh-America had standing to raise Itoh-Japan's rights, it would not be entitled to any immunity because the hiring practices questioned are those of Itoh-America, not Itoh-Japan; and (4) that even if Itoh-America could invoke the full benefit of Article VIII(1) it would not be immune from Title VII because "Article VIII(1) was designed to prevent the imposition of ultra-nationalistic policies with respect to employment, not shield them" and because United Nations Charter provisions, which supersede conflicting treaty provisions, state that all members pledge themselves to promote freedom for all without distinction as to race, thereby vitiating any right to discriminate that Itoh-America may have under the Treaty.

In view of the Court's conclusion that Itoh-America does not come within the purview of Article VIII(1) and that any rights Itoh-Japan has under this article do not shield the employment practices in question, the Court need not determine whether Article VIII(1) provides any immunity from Title VII to any entity in any situation, or whether, assuming such immunity exists under the terms of the Treaty, it has been superseded by United Nations Charter provisions or subsequent foreign policy practice of the United States and Japan. Accordingly, the focus of the following discussion is upon the questions of whether Itoh-America itself is entitled to the rights conveyed by Article VIII(1) and, if not, whether it is shielded from Title VII in the instant case by any Article VIII(1) rights of Itoh-Japan that it may invoke.

## II. Absolute Rights Claimed by Itoh-America

On July 22, 1953, the United States and Japan consummated a Treaty of Friendship, Commerce and Navigation for the purpose, as stated in the preface of the Treaty, of "strengthening the bonds of peace and friendship traditionally existing between them and of encouraging closer economic and cultural relations between their peoples . . . by arrangements promoting mutually advantageous commercial intercourse, encouraging mutually beneficial investments, and establishing mutual rights and privileges . . . based in general upon the principles of national and of most-favored nation treatment unconditionally accorded".

Itoh-America asserts that the Treaty gives it three absolute rights, the combined effect of which "is to create an absolute right on the part of United States and Japanese nationals and companies to send their own nationals to the other country to hold managerial and specialized positions within their respective affiliates and subsidiaries". The rights claimed are:

1. The absolute right to establish, maintain, control and manage a wide variety of commercial enterprises by nationals and companies of one country in the other country (Article VII, paragraph 1).

2. The absolute right of nationals of the two countries to enter the other country for the purpose of carrying on trade and engaging in related commercial activities between the two countries (Article I, paragraph 1).

3. The absolute right of nationals and companies of either country to engage, within the other country, managerial, professional, and other specialized personnel "of their choice," including their own nationals (Article VIII, paragraph 1).

Article VII, paragraph 1 provides in relevant part:

"Nationals and companies of either Party shall be accorded national treatment with respect to engaging in all types of commercial, industrial, financial and other business activities within territories of the other Party, whether directly or by agent or through the medium of any form of lawful juridical entity. Accordingly, such nationals and companies shall

be permitted within such territories: (a) to establish and maintain branches, agencies, offices, factories, and other establishments appropriate to the conduct of their business; (b) to organize companies under the general company laws of such other "Party, and to acquire majority interests in companies of such other such Party; and (c) to control and manage enterprises which they have established or acquired. . . ."

Article I, paragraph 1 provides in relevant part:

"Nationals of either Party shall be permitted to enter the territory of the other Party and to remain therein: (a) for the purpose of carrying on trade between the territories of the two Parties and engaging in related commercial activities; (b) for the purpose of developing and directing the operations of an enterprise in which they have invested, or in which they are actively in the process of investing, a substantial amount of capital. . . ."

Article VIII, paragraph 1 provides in relevant part:

"Nationals and companies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice. Moreover, such nationals and companies shall be permitted to engage accountants and other technical experts regardless of the extent to which they have qualified for the practice of a profession within the territories of the other Party, for the particular purpose of making examinations, audits, and technical investigations exclusively for, and rendering reports to, such nationals and companies in connection with the planning and operation of their enterprises, and enterprises in which they have a financial interest, within such territories."

### III. Scope of Article VIII(1)

As stated above, plaintiffs take the position that pursuant to the Treaty no entity is given the absolute right to hire managerial and specialized personnel in a racially discriminatory manner. In the alternative, plaintiffs contend that even if such a treaty right exists, which they deny, pursuant to the definitional terms of the Treaty it would extend only to a Japanese company doing business directly in the United States through a branch office and not to a subsidiary of a Japanese corporation which is incorporated under the laws of the United States. Since the Court is persuaded that such an absolute right, assuming it existed, would be inapplicable to Itoh-America in the instant case, the question of whether such a right exists at all need not be reached.

The crucial section of the Treaty relied upon by Itoh-America is Article VIII(1) which by its terms provides that "nationals and companies of either Party shall be permitted to engage within the territories of the other Party [personnel] of their choice." Stated otherwise in terms of the instant inquiry, a company of Japan is entitled to engage within the territory of the United States personnel of its choice. Thus, the pivotal issue becomes the nationality of Itoh-America. Plaintiffs urge that the Treaty's own definitional section provides the unequivocal answer to this question. Article XXII(3) provides that "[c]ompanies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof . . . ." Under this definition Itoh-America is a company of the United States because it is incorporated under the laws of the State of New York. Its business operations in the United States are, therefore, those of a United States company in the United States, not the activities of a company of one party within the territory of the other party. Accordingly, plaintiffs argue any immunity from United States discrimination laws conveyed by Article VIII(1) does not apply to Itoh-America.

### A. Corporate Nationality Under Oldham

This analysis is supported by the case of *United States v. R. P. Oldham*, 152 F.Supp.

818 (N.D.Cal.1957), wherein the court used a similar standard for determining corporate nationality for purposes of the 1953 Japanese-American Treaty. Kinoshita & Co. Ltd., U.S.A. ("Kinoshita-America"), an American subsidiary of Kinoshita & Co. Ltd., Tokyo, was indicted along with others for conspiracy in restraint of commerce in Japanese wire nails. Kinoshita-America argued that Article XVIII of the Treaty dealing with antitrust violations provided the exclusive remedy available to the government in dealing with antitrust violations by American corporations which are wholly owned by Japanese corporations. The district court held that Article XVIII was not intended as an exclusive remedy; rather than replace American antitrust laws Article XVIII was intended to supplement them. This conclusion was based on the fact that "[t]he tenor of the entire Treaty is *equal* treatment to nationals of the other party, not better treatment". *Id.* at 823. The court further held that even if Article XVIII were held to provide an exclusive remedy for antitrust violations, Kinoshita-America lacked standing to invoke its protection.

The Court engaged in a two-step process to arrive at the conclusion that Kinoshita-America was not shielded from United States antitrust laws by Article XVIII. The first step was the determination of the nationality of Kinoshita-America. In order to resolve this question the court looked to Article XXII, the only definitional section of the Treaty, and pursuant to paragraph three of that Article determined that:

"[B]y the terms of the Treaty itself, as well as by established principles of law, a corporation organized under the laws of a given jurisdiction is a creature of that jurisdiction, with no greater rights, privileges or immunities than any other corporation of that jurisdiction."

*Id.*

Once the question of the nationality of Kinoshita-America was determined, the court completed the two-step inquiry by concluding that an American corporation has no standing to invoke Article XVIII as a defense to United States antitrust laws. Any protection this Article might afford against application of United States law would extend only to Japanese corporations, concluded the Court.

"If con-conspirator [sic] Kinoshita & Co. Ltd., Tokyo had wished to retain its status as a Japanese corporation while doing business in this country, it could easily have operated through a branch. Having chosen instead to gain privileges accorded American corporations by operating through an American subsidiary, it has for most purposes surrendered its Japanese identity with respect to the activities of this subsidiary."

*Id.*

Itoh-America urges that the *Oldham* rationale is inapplicable to the instant case on several grounds. It argues that determination of corporate nationality for purposes of Article VIII(1) should not turn on the place of incorporation and that *Oldham* was wrongly decided on this point. Instead, it contends, the same test used to determine corporate nationality for purposes of assaying the "treaty-trader" status of aliens desiring to enter this country—nationality of majority stockholders—should be used. In support of this argument, Itoh-America cites excerpts from the Treaty's legislative history. It further argues that the specific holding in *Oldham* has been tacitly overruled by *Calnetics Corporation v. Volkswagen of America, Inc.*, 532 F.2d 674 (9th Cir. 1976), *cert. denied*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976), and by recent judicial authority liberalizing standing requirements. Analysis of these contentions reveals that they are without merit.

### B. "Treaty-Trader" Test of Corporate Nationality

■ Despite the fact that the Treaty's own definitional section provides that the place of incorporation determines the nationality of a company for purposes of the Treaty and the fact that the court in *Oldham* determined that an entity identically situated to Itoh-America was an American

corporation for purposes of the Treaty, Itoh-America urges this Court to reach a different result.

As support for its argument that it should be considered a Japanese corporation, Itoh-America refers to guidelines promulgated by the Department of State for use by consular officials in determining whether a foreigner seeking admission to the United States qualifies as a "treaty-trader". Article I, paragraph 1 of the Japanese-American Treaty authorizes Japanese nationals to enter the United States as so-called treaty-traders "for the purpose of carrying on trade between the territories of the two Parties and engaging in related commercial activities. . . ." In order to qualify as a treaty-trader an alien must satisfy Department of State regulations which require, among other things, that the alien "be employed by an individual employer having the nationality of the treaty company, or by an organization which is principally owned by a person or persons having the nationality of the treaty country". 22 C.F.R. § 41.40 (1977). Department of State guidelines provide further that:

> "[t]he nationality of the employing firm is determined by those persons who own more than 50% of the stock of the employing corporation 'regardless of the place of incorporation'."

9 Foreign Affairs Manual Part II. Since it is wholly owned by Japanese interests, and thus is a Japanese corporation for treaty trader purposes, Itoh-America urges that it should be considered a Japanese corporation for purposes of Article VIII(3). Any other conclusion, it argues, requires the absurd result that once a Japanese corporation exercises the right given to it by Article VII(1) to incorporate an American subsidiary, that subsidiary loses all other rights under the Treaty.

The Court finds that resort to the treaty trader guidelines to determine corporate nationality for purposes of interpretation of the Treaty provisions is unwarranted in the face of the clear definitional provisions included in Article XXII(3) of the Treaty itself. Article XXII(3) unequivocally states that for the purpose of the Treaty the nationality of a corporation is determined by the place of incorporation. The fact that nationality is determined by a different standard for other purposes cannot alter the clearly stated test of the treaty itself.

Such a result, far from absurd, is entirely consistent with the purpose of the Treaty as stated in the preface: "[to promote] mutually beneficial investments [by] establishing mutual rights and privileges . . . based in general upon the principles of national and of most-favored-nation treatment . . . ." Article VII allows Itoh-Japan to incorporate a subsidiary like Itoh-America under the laws of the United States, and the fact that once such a subsidiary is incorporated it is considered a United States corporation does not mean that it is thereupon bereft of all rights under the Treaty. Article VII(1)(c) specifically provides that such subsidiaries shall be accorded national treatment, defined in Article XXII(1) as "treatment no less favorable than that accorded like enterprises controlled by nationals and companies of such other Party". As the court stated in *Oldham*,

> "Although [Article VII] equates domestic subsidiaries with their foreign parents, it does so only for purposes of that Article, which has the effect of according nationals of one party engaging in business within the territory of the other party the same treatment accorded nationals of the other party. For example, an American subsidiary of a Japanese parent is to have the same rights as any domestically owned corporation. The Article nowhere attempts to give greater rights to such subsidiaries."

152 F.Supp. 823–24.

Thus, while Itoh-America cannot claim whatever benefit Article VIII(1) was designed to convey, it can claim the most important right conveyed by the Treaty— the right to be treated as favorably as American corporations in this country. For, as the *Oldham* court stated:

"The tenor of the entire Treaty is equal treatment to nationals of the other party, not better treatment."

*Id.* at 823.

### C. Nationality Under § 2 of the Protocol

Further support for the proposition that Article VIII(1) does not apply to Itoh-America may be gleaned from an analysis of Article VI(3) read in conjunction with § 2 of the Protocol signed and entered simultaneously with the Treaty. Article VI(3) deals with compensation for property of companies of one country which is taken within the territory of the other country and provides in pertinent part: "Property of nationals and companies of either Party shall not be taken within the territories of the other Party except for a public purpose, nor shall it be taken without the prompt payment of just compensation." By its terms and pursuant to Article XXII definitional provisions, this protection would not extend to subsidiaries like Itoh-America, since they are companies of the United States. In an obvious attempt to extend this protection to such entities, the United States and Japan agreed to add § 2 of the Protocol, which provides:

"The provisions of Article VI, paragraph 3, providing for the payment of compensation shall extend to interests held directly or indirectly by nationals and companies of either Party in property which is taken within the territories of the other Party."

If indirect interests, e. g., subsidiaries like Itoh-America, were considered foreign corporations for purposes of Article VI(3), the addition of § 2 of the Protocol would have been redundant.

### D. Legislative History

As further authority for its argument that Article VIII(1) is applicable to United States-incorporated subsidiaries, Itoh-America cites broad language in the legislative history of the Treaty. It is true that the general references to Article VIII(1) contained in the legislative history do not specifically state that subsidiaries are not within the scope of that Article's protec-tion; however, they are not inconsistent with such a conclusion. Furthermore, it is a fundamental rule of statutory construction that in the absence of "statutory ambiguity, the court may not consider the legislative history. . . ." *Glenn v. United States,* 571 F.2d 270 (5th Cir. 1978). "[T]he plainer the language, the more convincing contrary legislative history must be." *United States v. United States Steel Corp.,* 482 F.2d 439, 444 (7th Cir. 1973), *cert. denied,* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973). Not only is the intended scope of Article VIII(1) unambiguous when examined in view of the Treaty's own definitional section, but also the legislative history is far from convincing that the interpretation advanced by Itoh-America is warranted. *Commercial Treaties, Hearings Before the Sub-Comm. of the Comm. on Foreign Relations,* 87th Cong., 1st Sess., at 3839 (1952).

### IV. Standing of Itoh-America to Raise Rights of Itoh-Japan

In addition to attacking the *Oldham* court's analysis of corporate nationality, Itoh-America contends that subsequent development and expansion of the concept of standing render obsolete the *Oldham* court's conclusion that an American subsidiary lacks standing to invoke Treaty provisions which by their terms apply only to Japanese corporations. In support of this argument, it cites, among other cases, *Calnetics Corporation v. Volkswagen of America, Inc.,* 532 F.2d 674 (9th Cir. 1976), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976), as well as the recent Supreme Court decision in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (hereinafter *"ADP"*).

It should be noted that the issue of standing becomes relevant only after the threshold finding that Itoh-America is not a company of Japan for purposes of Article VIII(1). For, if Itoh-America is determined to be a company of Japan, then it would fall within the specific terms of Article VIII(1) and it would be unnecessary to determine whether it has standing to invoke Itoh-Ja-

pan's rights under that article. Thus, the following discussion of the standing issue is predicated on the Court's above-stated conclusion that Itoh-America, as an American subsidiary, is provided no direct benefits under Article VIII(1).

In *ADP* the Supreme Court articulated a two-prong test for determining whether a party has standing. Standing exists when the party raising the claim "alleges that the challenged action has caused injury in fact, economic or otherwise" and that "the interest sought to be protected by the Complainant is arguably within the zone of interest to be protected or regulated by the [law] in question". 397 U.S. 152–53, 90 S.Ct. 829–830.

■ Given the clear language of the Treaty and the facts in dispute in the instant case the Court concludes that a detailed analysis of the standing issue is unnecessary. Even assuming that Itoh-America has standing to raise the rights of its foreign parent corporation, a question upon which the Court expresses no opinion, no exemption from employment discrimination laws is provided. Any latitude in hiring provided to Itoh-Japan by Article VIII(1) extends to employees whom Itoh-Japan itself hires. The hiring questioned by plaintiffs in the instant case is that of Itoh-America. Thus, even assuming that Article VIII(1) provided Itoh-Japan with absolute immunity from review of its employment decisions in the United States and that Itoh-America had standing to invoke this immunity, it is inapplicable to the hiring practices of Itoh-America.

Itoh-America's reliance upon *Calnetics Corp. v. Volkswagen of America, Inc.* appears to be two-fold: (1) it contends that *Calnetics* endorses a much-broader concept of standing which effectively overturns *Oldham* on that issue, and (2) it argues that *Calnetics* stands for the proposition that not only does it have standing to raise the rights of Itoh-Japan, but also it is entitled to those same rights itself—that is, any right belonging to a foreign corporation under the Treaty automatically belongs to its wholly-owned, United States incorporated subsidiary.

For the reasons discussed above, the question of whether Itoh-America has standing to raise Itoh-Japan's Article VIII(1) rights is of no moment; thus, it is of little importance whether *Calnetics* articulates a more liberalized standing test. Moreover, analysis of *Calnetics* reveals that it does not stand for the proposition that a United States-incorporated subsidiary of a foreign corporation has, in addition to all Treaty rights specifically granted it, those Treaty rights granted its foreign parent. There is nothing in *Calnetics* which is inconsistent with the conclusion reached in *Oldham* that nationality is determined by place of incorporation, and that United States incorporated subsidiaries of Japanese corporations are considered American corporations for purposes of discerning their rights under the Treaty.

In *Calnetics* a private antitrust action was brought against Volkswagen of America, Inc., ("VW–America"), a United States-incorporated subsidiary of a West German corporation, and its wholly-owned American-incorporated air-conditioning manufacturing subsidiary. The trial court concluded that defendants had violated the antitrust laws and as part of the remedy ordered divestiture of the local air-conditioning manufacturing company and prohibited VW–America from importing into the United States any Volkswagens with factory-installed air-conditioners for seven years. This remedy was ordered despite the fact that the West German Embassy previously had written the Department of State that such a ban would heavily discriminate against German citizens and German industry and in its opinion, would violate the provisions of a 1954 Treaty between Germany and the United States proscribing discrimination against the products of one party within the territory of the other. The Ninth Circuit reversed the lower court finding of antitrust violations and questioned the remedy of an import ban restriction on the grounds that it "discriminates against the German automobile manufacturer because it forbids him to sell in the

United States cars with factory-installed air-conditioning while imposing no similar restriction on domestic automobile manufacturers". *Id.* 532 F.2d at 693.

Read in a light most favorable to Itoh-America, *Calnetics* stands for the proposition that a United States incorporated subsidiary of a foreign corporation has standing to raise the claim that the Treaty rights of its parent may be affected by court ordered relief. In this respect, it is important to note the distinction between the facts in *Calnetics* and the instant case. In *Calnetics* the Court of Appeals determined that the import ban ordered by the trial court might discriminate against the products of VW–Germany in contravention of that company's Treaty rights. By contrast, given this Court's interpretation of the Treaty involved in the instant case, Itoh-Japan has no Article VIII(1) right to staff Itoh-America. Accordingly, as stated above even if Itoh-America has standing to invoke the Treaty rights of Itoh-Japan, it can claim no shield against application of Title VII to its own employment practices.

### V. Conclusion

Faced with an interesting question of first impression, the Court concludes that the 1953 Japanese-American Treaty does not provide Itoh-America with immunity from Title VII. Although many novel issues were raised by the parties in their extensive legal memoranda, not all were addressed or resolved by this Court in view of the dispositive nature of the threshold inquiries.

Given the Treaty's own definitional terms, Itoh-America is a company of the United States for purposes of the interpretation of Article VIII(1). Thus, it can claim no direct protection under Article VIII(1), which applies only to companies of one party within the territories of the other party. Furthermore, even assuming that Article VIII(1) provides absolute immunity from Title VII to Itoh-Japan and that Itoh-America has standing to assert Itoh-Japan's Treaty rights in this action, questions the Court need not resolve, the motion to dis-

miss must be denied. Any absolute rights granted to Itoh-Japan apply only to its own hiring decisions; the practices challenged in the present litigation are those of Itoh-America. Itoh-America is a United States company for purposes of Title VII and, like other United States companies, is subject to suit on the grounds that its employment practices are racially discriminatory. Accordingly, Itoh-America's motion to dismiss for failure to state a claim upon which relief may be granted is hereby denied.

### ON MOTION TO AMEND JUDGMENT AND FOR CERTIFICATION FOR IMMEDIATE APPEAL

On March 1, 1979, this Court entered a Memorandum and Opinion denying defendant's motion to dismiss. Defendant subsequently filed a motion to amend interlocutory order on March 9, 1979, requesting certification of this Court's Order to the Fifth Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(b) (1970). The Court concludes that the March 1 Order involves a controlling question of law as to which there are substantial grounds for difference of opinion and that an immediate appeal may materially advance the ultimate determination of this litigation. Given the complex nature of the case and the fact that the Court has certified a nationwide class, it is apparent that a trial on the merits may prove long, arduous and expensive to all of the parties. In addition, as discussed below, it has come to the Court's attention that the Department of State has issued an opinion letter reaching a different conclusion as to the key issue in the March 1 Order.

In *Kelley v. Societe Anonyme Belge D'Exploitation, Etc.*, 242 F.Supp. 129, 148 (E.D.N.Y.1965) (hereinafter "Kelley") the Court was faced with the interpretation of a treaty and after construing the treaty the Court stated:

"While the court reaches this decision with certainty, it is not unmindful of the admonition of Mr. Justice Cardozo, then sitting on the New York Court of Appeals, in *Techt v. Hughes*, 229 N.Y. 222, 247, 128 N.E. 185, 193, 11 A.L.R. 166, cert.

denied, 254 U.S. 643, 41 S.Ct. 14, 65 L.Ed. 454 (1920):

'No one can study the vague and wavering statements of treaties and decision in this field of international law [the application of a treaty] with any feeling of assurance at the end that he has chosen the right path. One looks in vain either for uniformity of doctrine or for scientific accuracy of exposition. There are wise cautions for the statesmen. There are few precepts for the judge.'

The court, therefore, deems it advisable to certify this decision to the Court of Appeals for the Second Circuit pursuant to 28 U.S.C. § 1292(b)."

Similarly, this Court concludes that in view of the above-stated considerations and the novelty of the issue involved, the logic of the *Kelley* court is applicable, and certification to the Fifth Circuit of the following question is appropriate: Does the 1953 Treaty of Friendship, Commerce and Navigation between the United States and Japan provide American subsidiaries of Japanese corporations with the absolute right to hire managerial, professional and other specialized personnel of their choice, irrespective of American law proscribing racial discrimination in employment?

For purposes of computing the allowable time for the filing of a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b), the Court's March 1, 1979, Order shall be deemed to be entered as of the date indicated below. All proceedings in this action shall be stayed pending resolution of the appeal.

Subsequent to the March 1 Order this Court learned of the pendency of a very similar case in the Southern District of New York styled *Avigliano, et al. v. Sumitomo Shoji America, Inc.*, 77 Civ. 5641, wherein the same issue involving the 1953 Treaty of Friendship, Commerce and Navigation between the United States and Japan is presented. The Equal Employment Opportunity Commission (EEOC) contacted the Department of State requesting an opinion on four questions raised in the *Avigliano*

case. On October 26, 1978, the EEOC sent the court in *Avigliano* the Department of State's opinion letter containing an analysis of the very issue deemed controlling by this Court in its March 1 Order. In response to the question of whether the rights conveyed by Article VIII differ depending upon where the challenged company is incorporated the Department of State replied:

"Article VIII is addressed to 'nationals and companies of either Party . . . within the territories of the other Party.' Article XXIII defines 'companies' as 'corporations, partnerships, companies and other associations, whether or not with limited liability and whether or not for pecuniary profit.' In determining the scope of Article VIII, we see no grounds for distinguishing between subsidiaries incorporated in the United States owned and controlled by a Japanese company and those operating as unincorporated branches of a Japanese company, nor do we see any policy reason for making the applicability of Article VIII dependent on a choice of organizational form."

In view of this Court's conclusion in its March 1 Order that Article VIII(1) does not apply to United States incorporated subsidiaries of Japanese corporations, it is apparent that there exists a conflict between this Court's interpretation of the Treaty and the Department of State's interpretation. Well-established principles of treaty interpretation provide that:

"While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight."

*Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961). Nonetheless,

"Writers of authority agree that treaties are to be interpreted upon the principles which govern the interpretation of contracts in writing between individuals, and are to be executed in the utmost good faith, with a view to making effective the purposes of the high contracting parties; that all parts of a treaty are to receive a reasonable construction, with a view to giving a fair operation to the whole."

*Sullivan v. Kidd*, 254 U.S. 433, 439, 41 S.Ct. 158, 160–61, 65 L.Ed. 344 (1920). Thus, "Courts are to give substantial weight to the construction, if any, which is placed upon the treaty by the political branch; however, they are not required to abdicate what is basically a judicial function." *Kelley, supra* at 136.

■ Application of these rules of construction to the present case dictate that this Court reconsider its earlier decision in light of the opinion letter of the Department of State, since that opinion is entitled to great weight. After careful consideration and analysis, and with all due respect and deference to the Department of State opinion letter, the Court concludes nonetheless that the March 1 Order should stand as written. The Department of State letter contains a very brief analysis of the corporate nationality question and its bearing on the applicability of Article VIII(1) of the Treaty. No mention whatsoever is made of the Article XXIII(3) provision which provides that corporate nationality is determined by place of incorporation and which, when construed with Article VIII(1), led the Court to conclude that Itoh-America is not entitled to whatever benefits are conveyed by Article XIII(1). Similarly, no reference is made to the case of *United States v. R. P. Oldham*, 152 F.Supp. 818 (N.D.Cal.1957), which interprets corporate nationality under the Treaty the same way as this Court.

Despite the contrary conclusion reached by the Department of State, the Court cannot "abdicate" its judicial function and ignore fundamental rules of legal construction which require "that all parts of a treaty are to receive a reasonable construction, with a view to giving a fair operation to the whole". *Sullivan, supra* at 439. Such an analysis compels the conclusion that Itoh-America is a company of the United States under the terms of the Treaty and that its employment activities in this country are not the activities of a company of Japan within the meaning of Article VIII(1). Accordingly, the Court concludes that the Department of State opinion letter does not warrant a reversal of the Court's earlier order denying defendant's motion to dismiss.