ZENITH RADIO CORPORATION

v.

MATSUSHITA ELECTRIC INDUSTRI-AL CO., LTD. et al.

In re JAPANESE ELECTRONIC PROD-UCTS ANTITRUST LITIGATION

MDL No. 189.
Civ. A. No. 74–2451.

United States District Court,
E. D. Pennsylvania.

June 26, 1980.

See also, D.C., 494 F.Supp. 1246.

Edwin P. Rome (argued), John Hardin Young, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for plaintiff, Zenith Radio Corp.

Lance Gotthoffer (argued), Peter J. Gartland, Wender, Murase & White, New York City, for moving defendant.

## MEMORANDUM AND ORDER

*(1953 Treaty of Friendship, Commerce and Navigation with Japan)*

EDWARD R. BECKER, District Judge.

In this memorandum we address the motion of defendant Sharp Electronics Corporation ("SEC") for summary judgment against Zenith Radio Corporation ("Zenith") on what remains of Zenith's claims under the Antidumping Act of 1916 ("the 1916 Act"), 15 U.S.C. § 72.[1] In our opinion and order of April 14, 1980, Pretrial Order No. 237, 494 F.Supp. 1190, (hereinafter cited as "Antidumping Opinion"), we dismissed the 1916 Act claims of National Union Electric Corporation, the other plaintiff in this antitrust litigation, and granted summary judgment in favor of the defendants on a major portion of Zenith's claims under the 1916 Act. An appeal of that opinion and order pursuant to 28 U.S.C. § 1292(b) is currently pending in the U.S. Court of Appeals for the Third Circuit, No. 80–8072. While we initially entertained some qualms as to whether we should hear a motion concerning the 1916 Act while our previous construction of the Act is on appeal, we have determined that in view of the remaining portion of Zenith's claim under the Act, SEC's motion is properly before us.[2]

SEC contends that Zenith's claims under the 1916 Act are barred by Article XVI(1) of the Treaty of Friendship, Commerce and Navigation between the United States and Japan, 4 U.S.T. 2063, T.I.A.S. No. 2863 (1953) ("the Treaty"). Article XVI(1) of the Treaty provides as follows:

Products of either Party shall be accorded, within the territories of the other Party, national treatment . . . in all matters affecting internal taxation, sale, distribution, storage and use.

The Parties to the Treaty are the two nations, the United States and Japan. The Treaty defines the term "national treatment" as follows:

The term "national treatment" means treatment accorded within the territories of a Party upon terms no less favorable than the treatment accorded therein, in like situations, to nationals, companies, products, vessels or other objects, as the case may be, of such Party.

Article XXII(1). Thus the treaty requires that products of Japan be accorded, in the United States, treatment upon terms no less favorable than that accorded, in like situations, to products of the United States.

The Antidumping Act of 1916 creates civil and criminal penalties for importing or selling, or assisting in importing or selling, articles in the United States at prices which are below the "actual market value or wholesale price of such articles" in the country of origin, after certain adjustments to the home market price are made. 15

---

1. No other defendant has joined in SEC's motion. However, the other defendants have indicated that in their view, they have the right to assert the arguments comprehended in SEC's motion in the pending appeal of Pretrial Order No. 237 (April 14, 1980) in the Third Circuit. *See* n.2, *infra.*

 A description of the litigation may be found in our Opinion and Order (Introduction to Summary Judgment Motions; Subject Matter Jurisdiction), 494 F.Supp. 1161, also filed on April 14, 1980.

2. In addition, the Third Circuit may want our views on the issues comprehended in SEC's motion, since SEC's argument, if valid, would constitute an alternate ground in support of our order of April 14, 1980, Pretrial Order No. 237. In considering the § 1292(b) appeal, the Third Circuit may reach all issues "properly put in dispute" bearing upon whether the order appealed from was appropriate. *Consolidated Express, Inc. v. New York Shipping Ass'n,* 602 F.2d 494 (3d Cir. 1979).

U.S.C. § 72. By its terms, the Act has no application to articles manufactured in the United States. SEC is a New York corporation which resells in the United States products manufactured in Japan by its Japanese parent corporation, Sharp Corporation. Sharp Corporation, also a defendant, is a major manufacturer of consumer electronic products. SEC contends that its resale pricing decisions are restricted by the 1916 Act in a manner which discriminates between products which originate in Japan and those which originate in the United States, in violation of the Treaty.[3]

Zenith replies that SEC, as a corporation organized under the laws of the state of New York, has no standing to invoke the Treaty, citing *Avigliano v. Sumitomo Shoji America, Inc.,* 473 F.Supp. 506 (S.D.N.Y.), *aff'd on rehearing,* 21 F.E.P. Cases 580 (S.D.N.Y.1979), *appeal pending,* No. 80–7418 (2d Cir.), and *Spiess v. C. Itoh & Co. (America), Inc.,* 469 F.Supp. 1 (S.D. Tex.1979), *appeal pending,* No. 79–2382

(5th Cir.). Zenith also contends that, since the 1916 Act applies equally to any person who violates its prohibitions, whether domestic or foreign, the Act therefore does not discriminate in violation of the treaty. Finally, Zenith argues that SEC's reading of the Treaty would in effect repeal the 1916 Act with respect to each of the numerous countries with which the United States has entered into a treaty of friendship, commerce and navigation, *see* p. 1267 *infra,* even though nothing in the legislative history of Senate consideration of the Treaty suggests such a result.

 Although SEC's motion raises some difficult questions, we need not and do not reach those questions, for we will deny the motion solely on the ground that the Senate, in approving the Treaty, never intended thereby to repeal the Antidumping Act of 1916.[4] It is a "cardinal rule" of statutory construction that "repeals by implication are not favored." *E. g., Tennessee Valley Authority v. Hill,* 437 U.S. 153, 189,

---

3. SEC does not contend that Article XVI of the treaty affects in any way the power of the United States to control importation by levying customs duties or by other means. Accordingly, SEC does not contend that the Treaty rendered illegal the assessment of dumping duties under the Antidumping Act of 1921, 19 U.S.C. § 160 *et seq.,* prior to the revision and reenactment of that law in 1979, 19 U.S.C. § 1673 *et seq. See generally* Antidumping Opinion, 494 F. Supp. at 1223–1226 (comparing 1916 and 1921 Antidumping Acts).

4. Thus we do not reach the standing issue raised by Zenith. We note, however, that SEC contends that the decisions cited by Zenith are inapposite here because they are grounded in substantive provisions of the Treaty other than Article XVI and are not based on principles of standing which are of general application to interpretation of the Treaty. *Cf. Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674, 693 (9th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976) (treaty considered in litigation involving no parties of foreign nationality). SEC notes in this regard that Article XVI(1) of the treaty, unlike the provisions considered in *Avigliano, supra,* and *Spiess, supra,* protects Japanese "products" and not just Japanese nationals or Japanese companies. Accordingly, SEC argues, an American national or American company which resells Japanese products in the United States is entitled to invoke the protection of Article XVI(1) against discriminatory treatment

of the products which it resells. We express no opinion on the merits of this argument.

We also do not undertake the comparison of the 1916 Act with the Robinson-Patman Act, which would be necessary if we accepted SEC's contentions. The Treaty mandates only that Japanese products be accorded treatment as favorable as that afforded to products made in the United States. SEC complains that as a reseller of Japanese products, it is subjected to a law which does not apply to domestic products. However, the 1916 Act is a price discrimination law which was intended to extend to importers the strictures of Section 2 of the Clayton Act, the price discrimination law which controlled domestic commerce in 1916 and which, as amended by the Robinson-Patman Act in 1936, applies to domestic commerce today. *See* Antidumping Opinion, 494 F.Supp. at 1217–1223. Thus the prohibitions of the 1916 Act are similar, in gross terms, to prohibitions which do apply to resellers of domestic products as well, *viz,* the Robinson-Patman Act. To the extent that, in SEC's submission, the Treaty requires that the legal strictures which apply to sellers of imported goods and those which apply to sellers of domestic products must be precisely identical, we could not rule on SEC's motion without making a detailed comparison between the 1916 Act and the Robinson-Patman Act. Our disposition of SEC's motion renders that comparison unnecessary.

98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978); *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976). In order for a subsequent enactment of Congress to constitute an implied repeal of an earlier statute, the intention of the legislature to repeal must be "clear and manifest." *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). Not only is there nothing in the legislative history of Senate consideration of the Treaty to indicate that the Senate intended to repeal by implication any federal statute but, as Zenith correctly notes, there are clear indications to the contrary.

As Chief Justice Marshall explained in *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829), a treaty provision which does not require specific measures by the political branches of government for its execution is enforceable in the courts as if it were a statute:

> Our Constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legislative provision.

The Treaty on which SEC relies has been recognized by the Courts to be self-executing. *In re Fotochrome, Inc.*, 377 F.Supp. 26, 29 (E.D.N.Y.1974), aff'd, *Fotochrome, Inc. v. Copal Company, Limited*, 517 F.2d 512 (2d Cir. 1975); *see also Oregon-Pacific Forest Products Corp. v. Welsh Panel Co.*, 248 F.Supp. 903, 910 (D.Or.1965). Since a self-executing provision of a treaty is legally equivalent to a federal statute, a treaty provision may operate as a repeal of a prior inconsistent federal statute. *Cook v. United States*, 288 U.S. 102, 119, 53 S.Ct. 305, 311, 77 L.Ed. 641 (1933); *Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888). Applying this principle, Judge Weinstein held in *Fotochrome, supra*, that "the 1953 Treaty with Japan and the 1970 United Nations Convention have superseded in small measure the 1938 Bankruptcy law." 377 F.Supp. at 31. Judge Weinstein consulted the clear language of

Article IV(2) of the Treaty and of the United Nations Convention to hold that an award made by the Commercial Arbitration Association in Tokyo, Japan, which had the effect of a final judgment under Japanese law, would be enforceable in a bankruptcy proceeding in the United States courts, even though a domestic arbitration award would not have been enforceable under the circumstances presented in *Fotochrome*. The Second Circuit affirmed, relying solely on the United Nations Convention which, in the appellate court's view, had superseded the pertinent clause of the bilateral Treaty with Japan. 517 F.2d at 518 n.4.

While a self-executing treaty provision is "equivalent to an act of the legislature" in its legal effect, *Foster v. Neilson, supra*, we are aware of no decision holding that a treaty provision should be accorded any greater legal effect than a statute enacted by Congress. Hence we deem the principles governing the implied repeal of statutes by subsequent statutes to apply with equal force to subsequent treaty provisions. Under well-established principles concerning implied repeals, our inquiry is two-fold. First, we must examine the language of the statute and of the treaty to determine whether there is "a positive repugnancy" between them, *Hill, supra*, 437 U.S. at 190, 98 S.Ct. at 2299, quoting *Wood v. United States*, 41 U.S. (16 Pet.) 342, 363, 10 L.Ed. 987 (1842), which renders them irreconcilable. Second, we must examine the legislative history of the Treaty to determine whether there is "some affirmative showing of an intention to repeal," *Hill, supra,* quoting *Mancari, supra*.

Looking first to the language of the 1916 Act and of the Treaty, we do not find a "positive repugnancy" such as to amount to repeal by implication. Article XVI(1) of the Treaty appears to be directed against measures such as discriminatory excise taxes assessed only on products of foreign origin. The language of the treaty provision does not clearly reach a statute like the 1916 Act, which has as its predominant purpose the regulation of international commerce, but may also have an effect on the

prices at which imported goods are sold within the United States. SEC concedes that Article XVI of the Treaty does not limit the power of the United States to regulate the importation of foreign goods. *See* n.3, *supra.* Nor, obviously, does it require that we view imported goods in all respects as though they originated in the United States. The definition of "national treatment" in Article XXII of the Treaty requires that foreign products be treated as favorably as domestic products only "in like situations," a qualifying phrase of indefinite scope. *See also* n.4, *supra.* We conclude that while the language of the Treaty is fairly susceptible of the interpretation which SEC proposes, it by no means compels that interpretation. Accordingly, there does not exist that "positive repugnancy" without which we may not find an implied repeal on the face of the Treaty.

We turn then to the legislative history of Senate consideration of the Treaty to determine whether or not the Senate intended by its approval to repeal any existing federal statute. We find not only an absence of any indication that the Senate intended such a repeal, but also clear indications that it did not intend to alter existing federal law.

The Treaty with Japan was "part of a program to develop a series of modern commercial treaties whose general aim is to assure protection for American citizens and American interests in foreign countries." Sen.Exec.Rep.No.5, 83d Cong., 1st Sess. at 2 (1953). The entire program of negotiating treaties of friendship, commerce and navigation was expressly authorized by Congress in the Mutual Security Act of 1952, § 7(k), which directed the State Department to "accelerate a program of negotiating treaties of commerce and trade . . . to encourage and facilitate the flow of private investment to countries participating in programs under this Act." 66 Stat. 146 (1952) (adding § 516(d) to the Mutual Security Act of 1951). Thus the postwar treaties were intended primarily to facilitate American private-sector investment in foreign nations. *See* H.Rep.No.1922, 82d Cong., 2d Sess. (1952).

When it recommended adoption of the Treaty with Japan, the Senate Foreign Relations Committee considered at the same time Treaties of Friendship, Commerce, and Navigation with seven other countries: Israel, Ethiopia, Italy, Denmark, Greece, Finland, and Germany. Sen.Exec.Rep.No.5, *supra.* Thereafter, the Senate gave its advice and consent to the Treaty with Japan and to the same seven other treaties in a single vote. 99 Cong.Rec. 9316 (1953). Article XVI(1) of the Treaty with Japan, upon which SEC now relies, appears in substantially the same form in the other treaties considered at the same time by the Senate Foreign Relations Committee. Sen.Exec.Rep.No.5, *supra*, at 3–5. Thus the reading of Article XVI(1) which SEC proposes would repeal the Antidumping Act of 1916 at least with respect to imports from the countries which are parties to those bilateral treaties. If similar language appears in U.S. treaties with its other major trading partners, a matter which the parties herein have not explored, then on SEC's reading the 1916 Act would not apply to imports from those nations either.

This sweeping result has no support in the legislative history of Senate consideration of the eight treaties. The Foreign Relations Committee commented on Article XVI only that:

> Article XVI concerns national treatment on matters affecting the internal sale of items imported from the other party. This provision would prevent, for example, internal taxes which would bear more heavily upon foreign products than upon those domestically produced.

*Id.* at 5. In fact, Assistant Secretary of State Samuel C. Waugh assured the Senate Subcommittee on Commercial Treaties that nothing in the treaties would affect existing federal law:

> The extension of reciprocal privileges to aliens in this country has not, as an object in itself, entered into the planning or execution of the program of negotiating these treaties, but is necessary in order to secure American rights abroad. Mutuali-

ty is the only basis upon which it is possible to obtain the assurances required. In the current series of treaties of the type now before you *it has not been the intent to introduce any new provisions that would be at variance with State or Federal laws.* A number of provisions are based upon provisions of treaties previously approved by the Senate, however, and State legislation may be affected, albeit generally in relatively minor respects.

Hearing before the Subcommittee of the Committee on Foreign Relations, United States Senate, 83rd Cong., 1st Sess. at 3 (July 13, 1953) (emphasis added).

During an earlier hearing on five of the eight treaties, not including the one with Japan which at that time had not yet been submitted to the Senate, a question arose as to whether the antitrust laws of the United States would be affected by the treaties—specifically, by the "restrictive business practices clause" subsequently incorporated into the Treaty with Japan as Article XVIII(1). The Department of State responded that "[t]he clause is not regarded as creating new substantive antitrust law or new procedures of antitrust enforcement in the United States." Hearing Before a Subcommittee of the Committee on Foreign Relations, United States Senate, 82nd Cong., 2d Sess. at 29 (May 9, 1952). Thus the only time that the question arose during Senate consideration of the eight treaties, the Department of State represented to the Subcommittee on Commercial Treaties that the pending treaties would make no substantive changes in American antitrust law.[5] We have held that the Antidumping Act of 1916 is part of the corpus of antitrust law, intended to extend Section 2 of the Clayton Act to international commerce. Antidumping Opinion, 494 F.Supp. at 1213–1215 and 1217–1223.

 Since the Senate did not intend by its enactment of the Treaty with Japan to alter any existing federal law, and specifically did not intend to alter American antitrust law, and since the language of the Treaty does not exhibit a clear repugnancy with the Antidumping Act of 1916, we cannot find that the Treaty repealed the 1916 Act by implication with respect to all products imported from Japan. Accordingly, SEC's motion for summary judgment will be denied.

---

**5.** Although this question arose prior to consideration by the Subcommittee on Commercial Treaties of the Treaty with Japan, the State Department's representation as quoted in the text, *supra*, is pertinent to the interpretation of the Treaty with Japan. The treaties then under consideration were essentially the same as the Treaty with Japan, and were eventually considered by the full Committee on Foreign Relations and by the full Senate along with the Treaty with Japan, on a consolidated basis. In *In the Matter of Grand Jury Investigation of the Shipping Industry,* 186 F.Supp. 298, 320 (D.D.C.1960), the court relied on the same State Department letter which we consider here, finding the representations therein pertinent to the interpretation of the same Treaty with Japan which is now before us.