**TOKYO SANSEI (NEW YORK), INC.,
et al., Plaintiffs,**

v.

**P. A. ESPERDY, etc., Defendants.**

No. 68 Civ. 4524.

United States District Court
S. D. New York.

April 9, 1969.

Whitman, Ransom & Coulson, New York City, for plaintiffs; Edith Lowenstein, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., for Southern District of New York, New York City, Daniel Riesel, Sp. Asst. U. S. Atty., of counsel.

## OPINION

FRANKEL, District Judge.

The question before the court is whether plaintiff Jiro Takizawa is entitled to judicial reversal or modification of an administrative decision (by defendant District Director, affirmed by the Regional Commissioner, of the Immigration and Naturalization Service) denying his application to be classified as a "non-immigrant alien" in the category of "treaty trader" under § 101(a) (15) (E) (i) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101(a) (15) (E) (i). The proceeding from which this issue has crystallized began with a motion by all four of the named plaintiffs for a temporary injunction against threatened hurts which have now been postponed, if not eliminated as threats, by agreement of the parties. It is unnecessary now to detail fully the discussions and the stipulated arrangements by which the original motion has been transmuted into cross-motions for summary

judgment.[1] Suffice it to say that there are no material issues of fact; that the undisputed question for the court is whether the decision of the Service denying the claim to "treaty trader" status was "arbitrary" or "capricious," 5 U.S.C. § 706(2) (A); Nippon Express U.S.A., Inc. v. Esperdy, 261 F.Supp. 561, 565–566 (S.D.N.Y.1966); and that the parties and the court perceive nothing to prevent, or to warrant postponing, decision of that question.

### I.

The statutory definition of treaty traders in 8 U.S.C. § 1101(a) (15) (E)— along with the succeeding definition of "treaty investors," a category of minor and incidental interest here—is embraced in the following clauses:

"The term 'immigrant' means every alien except an alien who is within one of the following classes of non-immigrant aliens—

  *   *   *   *   *   *

"(E) an alien entitled to enter the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which he is a national * * *: (i) solely to carry on substantial trade principally between the United States and the foreign state of which he is a national; or (ii) solely to develop and direct the operations of an enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing, a substantial amount of capital * * *."

The statute derives from Section 3(6) of the Immigration Act of 1924, 43 Stat. 153, passed at a time when the country's hospitableness to long-term sojourns of aliens was not at its zenith. It has not been changed in any liberalizing or otherwise pertinent respect.[2]

■■ As is apparent from the nature of the subject matter, the according of treaty trader status is primarily and normally a matter for State Department officials. While it is permissible and by no means uncommon for the classification to be given by the Immigration Service to one already within our borders (the action sought by plaintiff Takizawa), the Service defers to and follows the relevant rulings of the State Department. See Nippon Express U.S.A. Inc. v. Esperdy, 261 F.Supp. 561, 564

---

1. It may be useful, however, to record one matter, if only to make explicit its elimination from the case. In the original motion papers, plaintiffs appeared to argue in effect that the administrative decision adverse to Takizawa's application was somehow a sham. The strong suggestion was that although the ruling is embodied in what purports to be a reasoned opinion on the merits, it is really a facade to conceal the agency's embarrassment over procedural slips and ambiguities in its prior actions. When the court proposed that this issue would have to be faced at the threshold (and not as a second question after ruling on what was, in plaintiffs' broad intimations, only a simulated decision), the issue was explicitly and definitively withdrawn by plaintiffs.

2. "In its original form the act of 1924 defined a treaty trader as an alien entitled to enter the United States solely to carry on trade under and in pursuance of an existing treaty of commerce and navigation.

"Under that provision of law a series of court decisions held in substance that the statute was not confined to an alien engaged in international trade but included an alien engaged in a purely local business within the United States. In one case [Kumonomido v. Nagel, 40 F.2d 42 (9th Cir. 1930)], the alien was a national of Japan serving as editor of a Japanese-American paper in San Francisco. In another case [Asakura v. Seattle, 265 U.S. 332 [44 S.Ct. 515, 68 L.Ed. 1041] (1924)], the alien was a native of Japan engaged as a pawnbroker in Seattle. In each of these two cases the alien was held to be entitled to status as a treaty trader.

"As a result of these decisions, the Congress on July 6, 1932, amended the law by requiring that in order for an alien to obtain treaty-trader status, he must carry on trade between the United States and the foreign state of which he is a national." S.Rep.No.1515, 81st Cong., 2d Sess. 563–64 (1950) (footnote omitted).

(S.D.N.Y.1966); Immigration & Naturalization Service Operations Instructions § 248.6 (renumbered as of Jan. 29, 1969). For that reason, and on familiar principles of statutory construction, Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States, 377 U.S. 235, 241, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964); Power Reactor Development Co. v. International Union of Electricians, Radio & Machine Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); Alaska Steamship Co. v. United States, 290 U.S. 256, 262, 54 S.Ct. 159, 78 L.Ed. 302 (1933), the longstanding views of the Department are germane for our problem. Thus, the parties and the court have referred and given weight to the more detailed definition in State Department Regulations, 22 C.F.R. § 41.40:

"§ 41.40 Treaty traders.

(a) An alien shall be classifiable as a nonimmigrant treaty trader if he establishes to the satisfaction of the consular officer that he qualifies under the provisions of section 101(a) (15) (E) (i) of the Act and that: (1) He intends to depart from the United States upon the termination of his status; and (2) If he is employed by a foreign person or organization having the nationality of the treaty country which is engaged in substantial trade as contemplated by section 101 (a) (15) (E) (i), he will be engaged in duties of a supervisory or executive character, or, if he is or will be employed in a minor capacity, he has special qualifications that will make his services essential to the efficient operation of the employer's enterprise and will not be employed solely in an unskilled manual capacity."

Particularizing still further for the guidance of consular officers, Volume 9 of the Department's Foreign Affairs Manual (Part II, Annotated Nonimmigrant Visa Regulations) contains the following Notes to 22 C.F.R. § 41.40:

"10.1 Highly trained and specially qualified technicians employed by firms qualifying as treaty traders who are engaged in the training or supervision of persons employed in manufacturing, maintenance and repair funcions are entitled to treaty trader status regardless of the fact that such technicians may themselves perform some manual duties.

"10.2 Qualified technicians coming to the United States to perform warranty repairs on intricate and complex products sold in the course of trade between the United States and the treaty country are entitled to treaty trader status if the employing firm establishes that it can not obtain the services of American technicians qualified to perform such repairs. The employing firms will be expected to plan for training American personnel to make such repairs and to utilize them as they become available for the performance of such functions. Consular officers should inquire of the employing firm regarding the training of American personnel at the time applications are made for visas for additional technicians." [3]

To complete the catalogue of basic legal materials, a trade treaty between the United States and Japan, effective since 1953, 4 U.S.T. 2063, provides in relevant part:

"Article I

"1. Nationals of either Party shall be permitted to enter the territories of the other Party and to remain therein: (a) for the purpose of carrying on trade between the territories of the two Parties and engaging in related commercial activities * * *.

---

3. 22 C.F.R. § 41.40 dates from August, 1959. The quoted portion of the Manual was published in January, 1964. The

Manual is distributed to all State Department consular offices and every office of District Director of Immigration.

"Article VII

"1. Nationals and companies of either Party shall be accorded national treatment with respect to engaging in all types of commercial, industrial, financial and other business activities within the territories of the other Party, whether directly or by agent or through the medium of any form of lawful juridical entity. Accordingly, such nationals and companies shall be permitted within such territories: (a) to establish and maintain branches, agencies, offices, factories and other establishments appropriate to the conduct of their business; (b) to organize companies under the general company laws of such other Party, and to acquire majority interests in companies of such other Party; and (c) to control and manage enterprises which they have established or acquired. Moreover, enterprises which they control, whether in the form of individual proprietorships, companies or otherwise, shall, in all that relates to the conduct of the activities thereof, be accorded treatment no less favorable than that accorded like enterprises controlled by nationals and companies of such other Party.

"Article VIII

"1. Nationals and companies of either Party shall be permitted to engage, within the territories of the

other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice. Moreover, such nationals and companies shall be permitted to engage accountants and other technical experts regardless of the extent to which they may have qualified for the practice of a profession within the territories of such other Party, for the particular purpose of making examinations, audits and technical investigations exclusively for, and rendering reports to, such nationals and companies in connection with the planning and operation of their enterprises, and enterprises in which they have a financial interest, within such territories.

"Article XXI

\*    \*    \*    \*    \*    \*

"4. Nationals of either Party admitted into the territories of the other Party for limited purposes shall not enjoy rights to engage in gainful occupations in contravention of limitations expressly imposed, according to law, as a condition of their admittance."

II.

Tokyo Sansei (New York), Inc., which appears and insists upon remaining as a named plaintiff along with Takizawa and the two other plaintiff individuals whose immigration status is in issue,[4] is

---

4. Defendant questions whether Tokyo Sansei has standing. The question is substantial. It seems likely that without the individual plaintiffs, the corporation, however great its incidental "interest" as a business matter, could not maintain the suit. And with the individuals in the case, the corporation, strictly speaking, is unnecessary, even assuming, as appears to be true, that it is paying the legal fees. Furthermore, whoever pays there is room for uncertainty whether the corporate and individual interests are thoroughly harmonious. The corporation, because of work done for it, is interested in having the men dubbed treaty traders, a classification which ties their presence in the United States to their work for the company. If, as has been suggested in the

papers, they had unique and scarce talents, they might well be entitled to immigrant status on that basis, 8 U.S.C. § 1153(a) (6), or to nonimmigrant status under 8 U.S.C. § 1101(a) (15) (H). But such a result—freeing them, and perhaps helping to invite them away from, their present employer and its less than lavish pay scale (see *infra*)—is not necessarily yearned after by the corporation. Having followed these thoughts a little way, the court finds it unnecessary to reach their conclusion. Defendant has made no motion to dismiss the corporate plaintiff. The question does not appear to have practical importance for the time being. It may be left unresolved without apparent hurt to anyone.

a wholly-owned subsidiary of a Japanese corporation, Tokyo Trading Co., Ltd. The latter sells and distributes radios, phonographs, tape recorders, and other electronic equipment and component parts manufactured in Japan. Tokyo Sansei has been accorded treaty trader status. It serves in effect as the American arm of Tokyo Trading, handling the latter's sales, distribution, and technical advice to American technicians on the repair and servicing of the various products.

Tokyo Sansei, with its headquarters in New York City, employs, apparently as its entire staff, eight Japanese nationals. It and they claim for all of them status as either treaty traders or treaty investors. It appears that this classification has been granted without difficulty to the general manager and personnel manager. For at least the three plaintiffs herein, however, the claim has thus far been denied. The immediate concern of the court, as has been stated, is plaintiff Takizawa.

This plaintiff first came to the United States in February 1966, admitted by certification of our Tokyo Embassy, not as a treaty trader, but as a treaty *investor*. He claims now that this classification resulted from an error by the American officials in Tokyo. The error seems to have been replicated a year later (February 12, 1967) when, after a visit to Brazil, he was again admitted on the same documents, as a treaty investor entitled to remain in this status until February 11, 1968. On January 30, 1968, he applied for a change of status to treaty trader. The denial of that application by defendant District Director, affirmed by the Regional Commissioner, brings Takizawa here.

The undisputed facts, as summarized by the Regional Commissioner, show that Takizawa is employed by Tokyo Sansei as one of five "technician-sales consult-

ants." [5] Describing his duties and qualifications in an affidavit, Takizawa said:

" * * * My specialty is phonographs and cartridge tape players. My duties involve examining merchandise samples received by Tokyo Sansei to see that they are in good working order and assisting our sales manager in discussing with customers their technical requirements for phonographs and cartridge tape players and communicating those requirements in Japanese to Tokyo Trading, the parent company in Japan. In addition, I review and examine phonographs and tape players which compete with products distributed by my employer, review damages which occur in shipment and recommend ways to avoid this, and make recommendations to my employer as to technical improvements to these Japanese products to make them more suitable for use in the United States. When necessary, I inspect and make final adjustments to the products after they are delivered to the customer."

Estimates by the Executive Director of Tokyo Sansei and by Takizawa himself indicate that he spends about 30% of his time assisting his superiors by working directly with them, about 30% in office paper work, and about 40% in adjusting and modifying merchandise arriving from Japan.

There is no evidence that Takizawa's functions are in any sense supervisory or executive. His education has been relevant to his work, but apparently suited to no more than the "technician's" position he occupies. After graduation from high school, he took a one-year course in basic electronics. Then, from 1961 to 1964, evidently while he worked full-time during the day, he took evening courses in the field of "production control," described only generally in his affidavit supporting his application here

5. In the letter to the American Embassy leading to Takizawa's original admission as a "treaty investor," Tokyo Trading described him as being destined to stay in the United States "for about 2 years for the purpose of assuming his post as an Assistant Sales Manager of Tokyo Sansei * * *."

in issue, and largely or wholly unrelated to his work here in the United States.

■ In sum, such concrete details as were permitted to emerge from the vague and general assertions by Takizawa and his employer about his high status and vital position all tended to diminish or belie the claims. Contrary to counsel's view that crass matters like pay are irrelevant to appraisals of business capacities, the officials of the Service were entitled to note, as they did, that Takizawa was paid $380 per month during his first two years or so in the United States and rose to a monthly salary of $490 thereafter. These modest earnings might comport, to be sure, with indispensably unique talents. But the officials charged with the primary administrative responsibility were entitled to consider the possible pressure toward a different inference.

In appealing to the Regional Commissioner the District Director's denial of Takizawa's application, his counsel urged that Takizawa's "work is not manual and cannot in any manner be done by local radio repairmen and technicians, aside from the fact that such repairmen and technicians are in short supply." While those conclusory assertions might, if accepted, have carried the day, the District Director and Regional Commissioner had powerful grounds for rejecting them. As the latter official said:

"The applicant's own affidavit [and, it might have been added, those of his superior, indicate] * * * that normally the merchandise received by the employer consists of samples, but that he spends a large part of his time working on products, primarily radios and tape recorders, which have been received by United States customers from the parent company in Japan.

"The entire record, including the representations made on appeal, has been carefully considered. The evening courses which the applicant took in production control were not directly related to servicing electronic equipment. His related technical training consisted only of a one-year basic electronics course. No explanation is given of the termination of his employment with an electronic manufacturer in November 1964 nor of his activity thereafter until he started working for Tokyo Trading (Japan) in August 1965. His experience on cartridge tape recorders was acquired in the United States. He has been and will be engaged primarily in repairing and servicing radios and tape recorders, items apparently mass-produced in Japan. The evidence does not establish further that he will be engaged in performing warranty repairs on intricate or complex products sold in the course of trade between the United States and Japan; nor that the employer has been unable to obtain the services of qualified technicians in the United States. It cannot be found solely by reason of his knowledge of Japanese that he has the 'special qualifications' contemplated by the regulations as being necessary to his employer's enterprise. Matter of Konishi, 11 I. & N.Dec. 815; Nippon Express U. S. A., Inc. v. Esperdy, U.S. D.C., N.Y., 261 F.Supp. 561 (1966).

"It is concluded that the applicant has not established (1) that he is continuing to maintain the nonimmigrant status under which he was admitted and (2) that he is eligible for classification as a nonimmigrant treaty trader. The appeal will, therefore, be dismissed."

### III.

■ It seems evident without long discussion that the ruling by the Service against Takizawa is rational, entirely within the range of allowable judgment, and in no remote sense arbitrary or capricious. As Takizawa's counsel recognized in her appeal to the Regional Commissioner, the burden was to show at least that he possessed skills enabling him to perform tasks which cannot "be done

by local * * * repairmen and technicians * * *." And even had he shown that, there would have been a further, and serious, question whether nobody entitled to permanent residence in the United States could have been trained to take over the duties Takizawa was sent here to perform as a "nonimmigrant" for an estimated two years.[6] The application failed in both respects. As Judge McLean said of another applicant in an analogous case, Takizawa's "special skills are not special enough, and no one individual who possesses these limited skills is essential enough." *Nippon Express, supra,* 261 F.Supp. at 565.

██ The suggestion that we have a shortage of technicians like Takizawa may or may not be correct. Assuming it is, it is not significant for the subject at hand. The existence of such a shortage—probably remediable in the case of any given employer by training people from the ranks of the unemployed—might justify the entry of a man like Takizawa as an *immigrant* under the statutory provisions for that different species of concern. But that was not the question before the Service, and it is not the question before this court. See note 4, *supra.*

On the only question now presented, the court would probably reach the result ordered by the Service if the task of initial decision belonged here. The far narrower scope of the court's reviewing authority makes clear that the administrative judgment must be sustained.

The motion of plaintiff Takizawa is denied. Defendant's motion is granted. Takizawa's complaint—or, perhaps more precisely, the claim of Takizawa tendered in the single complaint—will be dismissed. There being no just reason for delay, a judgment of dismissal will be entered under Fed.R.Civ.P. 54(b) in accordance with this decision.

Settle order.

6. See the reference earlier, from the State Department's Foreign Affairs Manual, to the direction that treaty trader employers "will be expected to plan for training American personnel to make [warranty] repairs and to utilize them for the performance of such functions."