Lisa M. AVIGLIANO et al., Plaintiffs,

v.

SUMITOMO SHOJI AMERICA, INC., Defendant.

No. 77 Civ. 5641 (CHT).

United States District Court, S. D. New York.

June 5, 1979.

Eisner, Levy, Steel & Bellman, P.C., New York City, for plaintiffs; Lewis M. Steel, New York City, of counsel.

Wender, Murase & White, New York City, for defendant; Jiro Murase, J. Portis Hicks, Edward H. Martin, Lance Gotthoffer, New York City, of counsel.

Equal Employment Opportunity Commission, Washington, D.C., for amicus curiae; Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, Lutz Alexander Prager, John D. Schmelzer, Washington, D.C., of counsel.

Ronald G. Copeland, Regional Counsel, New York City, Local Counsel, for E.E.O.C.

## OPINION

TENNEY, District Judge.

In this civil rights case, plaintiffs charge discrimination on the bases of sex and national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (1974), and of 42 U.S.C. § 1981 (1970).[1] They seek class action status. Plaintiffs are past and present female secretarial employees of defendant Sumitomo Shoji America, Inc.[2] ("Sumitomo"). Sumitomo is an "integrated trading company"[3] incorporated in New York as a wholly owned subsidiary of a Japanese corporation. The parent corporation is not a party to this action. Plaintiffs, seeking injunctive and compensatory relief, claim that they have been restricted to clerical jobs and not trained for or promoted to executive, managerial or sales positions for which Sumitomo favors male citizens of Japan. Jurisdiction is based upon 28 U.S.C. § 1331 and § 1343.[4]

Sumitomo denies that the company discriminates and now moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the claims asserted under Title VII and section 1981. Sumitomo claims that the provisions of Title VII and of section 1981 must yield to the right of freedom of choice in employment assured by the 1953 Treaty of Friendship, Commerce and Navigation between the United States and Japan, [1953] 4 U.S.T. 2063, T.I.A.S. 2863 (entered into force Oct. 30, 1953) ("the Treaty"). In addition to positing that Sumitomo is insulated from federal review of its employment practices by the Treaty, Sumitomo claims that plaintiffs' allegations of discrimination based on sex and national origin fail to state a claim under 42 U.S.C. § 1981.

Sumitomo also interposes four counterclaims, invoking this Court's ancillary jurisdiction essentially to seek redress for plain-

---

1. The complaint also includes a claim under the thirteenth amendment to the United States Constitution. As this claim apparently has been dropped, the Court sees no need to consider its merits.

2. The plaintiffs are eleven women, all of whom claim to be citizens of the United States except for one who claims to be a citizen of Japan. The complaint offers no other details of plaintiffs' claims.

3. "Integrated trading companies" engage primarily in the purchase and resale of goods, mainly in import and export markets. According to the Affidavit of J. Portis Hicks, sworn to May 18, 1978, there are fewer than a dozen integrated trading companies and these account for more than 50% of Japan's imports and exports.

4. Reference in the jurisdictional statement to 28 U.S.C. §§ 2201 and 2202 (the Federal Declaratory Judgment Act) remains a mystery to the Court, which can discern no basis for this relief. Plaintiffs seek judgment (1) enjoining the defendant from engaging in the alleged unlawful employment practices, both current and future; (2) directing the defendant to promote plaintiffs to executive and other managerial and sales positions and to institute a training program to upgrade plaintiffs and to take affirmative action to remedy the effects of past discriminatory practices; (3) for compensatory and punitive damages; and (4) for the cost of the action with reasonable attorney's fees. Unless plaintiffs wish to enlighten the Court, the demand for declaratory relief will be stricken.

tiffs' alleged abuse of legal process and tortious interference with Sumitomo's business activities. Plaintiffs cross-move for dismissal of the counterclaims pursuant to Rule 12(b) of the Federal Rules of Civil Procedure on the grounds that none states a claim upon which relief can be granted and that the Court lacks subject matter jurisdiction. For the reasons discussed below, the motions to dismiss plaintiffs' section 1981 claim and Sumitomo's first counterclaim are granted, and the motions to dismiss the Title VII claim and the remaining counterclaims are denied.

### The Treaty

On April 2, 1953 the United States and Japan entered into a Treaty of Friendship, Commerce and Navigation. The purpose of the Treaty is

> [to strengthen] the bonds of peace and friendship traditionally existing between them and [to encourage] closer economic and cultural relations between their peoples . . . by arrangements promoting mutually advantageous commercial intercourse, encouraging mutually beneficial investments, and establishing mutual rights and privileges . . . based in general upon the principles of national and most-favored-nation treatment unconditionally accorded . . .[5]

4 U.S.T. at 2066. The effect of the Treaty is to assure that nationals of one party are not discriminated against within the territory of the other party.[6]

Article VIII(1) of the Treaty provides, in pertinent part, that "[n]ationals and companies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys,

agents and other specialists of their choice." *Id.* at 2070. Sumitomo, in moving to dismiss the discrimination claims against it, frames the issue before this Court as whether Title VII and section 1981 of the Civil Rights Act of 1964 must yield to the right of freedom of choice in executive and other specialist personnel granted by Article VIII(1) of the Treaty. However, the Court finds that the issue before it is even more fundamental; that is, whether Sumitomo can invoke the aegis of the Treaty as sanction for its employment practices. The initial inquiry concerns the nationality of Sumitomo.

Article VIII(1) of the Treaty provides that Japanese and American corporations may engage within the territory of the other certain personnel of their choice. Article XXII, the definitional section of the Treaty, states in paragraph 3 that:

> [a]s used in the present Treaty, the term "companies" means corporations, partnerships, companies and other associations, whether or not with limited liability and whether or not for pecuniary profit. *Companies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party.*

*Id.* at 2079–80.[7] This is entirely consistent with traditional rules of corporate law which, for most purposes, treat a corporation as an entity distinct from its shareholders and accord to the corporation the citizenship of its place of incorporation:

> The theory of "corporate personality" permits a corporation to be regarded as a "person" with an existence—in the state of incorporation—separate from the nat-

---

5. Preface, Treaty of Friendship, Commerce and Navigation Between The United States of America and Japan (April 2, 1953).

6. *See United States v. R. P. Oldham Company,* 152 F.Supp. 818 (N.D.Cal.1957).

7. This provision has been paraphrased by the court in *United States v. R. P. Oldham Company, supra,* 152 F.Supp. at 823:

> [B]y the terms of the Treaty itself as well as by established principles of law, a corporation organized under the laws of a given jurisdiction is a creature of that jurisdiction, with no greater rights, privileges or immunities than any other corporation of that jurisdiction.

ural persons who own it. . . . [F]or purposes of federal court jurisdiction . . . a corporation is "deemed" to be a citizen of the state by which it was created.

Hornstein, *Corporate Law and Practice* § 281 (1959) (*citing Louisville, Cincinnati, and Charleston R. R. Co. v. Letson,* 43 U.S. (2 How.) 497, 555, 11 L.Ed. 353 (1844)). Sumitomo is incorporated under the laws of New York. Therefore, according to the very terms of the Treaty, Sumitomo is a company of the United States, not of Japan, and as such has no standing to invoke the freedom-of-choice provision granted by Article VIII(1) to companies of Japan within the territory of the United States.

This conclusion is supported by two district court decisions in which the 1953 Japanese-American Treaty was raised by way of defense. In *United States v. R. P. Oldham Co.,* 152 F.Supp. 818 (N.D.Cal.1957), a wholly owned American subsidiary of a Japanese corporation was one of five corporations indicted for conspiracy in restraint of commerce in Japanese wire nails. The defendant argued that Article XVIII of the Treaty, which dealt with antitrust violations, denied the federal court jurisdiction by providing the exclusive remedy. Not only did the district court hold that Article XVIII provided a supplemental rather than exclusive remedy, but it also found that, even were Article XVIII an exclusive remedy, the California-incorporated subsidiary lacked standing to invoke this provision. The nationality of the defendant was determined by the terms of Article XXII and the traditional principles of corporate law. Moreover, the *Oldham* court found this conclusion not inconsistent with the policies underlying the Treaty:

> If [the defendant] had wished to retain its status as a Japanese corporation while doing business in this country, it could easily have operated through a branch. Having chosen instead to gain privileges accorded American corporations by operating through an American subsidiary, it has for most purposes surrendered its Japanese identity with respect to the activities of this subsidiary.

*United States v. R. P. Oldham Co., supra,* 152 F.Supp. at 823.

In *Spiess v. C. Itoh & Co. (America), Inc.,* 469 F.Supp. 1 (S.D.Tex.1979), Judge Bue of the Southern District of Texas recently held that the 1953 Treaty did not provide the New York-incorporated subsidiary of a Japanese corporation with immunity from Title VII and section 1981. The motion before Judge Bue was essentially identical to that before this Court. Non-Japanese employees of a wholly owned domestic subsidiary of a Japanese corporation filed suit against their employer alleging racially discriminatory employment practices. The defendant C. Itoh & Co. (America), Inc. ("Itoh-America") moved to dismiss, arguing that under the Treaty it has an absolute right to hire personnel of its choice. In a well reasoned opinion, Judge Bue held:

> Given the Treaty's own definitional terms, Itoh-America is a company of the United States for purposes of the interpretation of Article VIII(1), . . . which applies only to companies of one party within the territories of the other party . . . . Itoh-America is a United States company for purposes of Title VIII and, like other United States companies, is subject to suit on the grounds that its employment practices are racially discriminatory.

*Id.* at 9.[8]

To avoid the conclusion that it has no standing to invoke the Treaty, Sumitomo

---

**8.** Itoh-America contended, as does Sumitomo, that subsequent developments and expansion of the concept of standing renders obsolete the *Oldham* analysis of the standing of corporate subsidiaries. Citing *Calnetics Corp. v. Volkswagon of America, Inc.,* 532 F.2d 674 (9th Cir. 1976), both Itoh-America and Sumitomo argue that the *Oldham* test has been implicitly overruled by a liberalized standard. In *Calnetics,* a private antitrust action was commenced against a United States-incorporated subsidiary of a West German corporation and its wholly owned American-incorporated air conditioning subsidiary. The district court found that the defendants had violated the antitrust laws and ordered, *inter alia,* a seven-year import ban in the United States of Volkswagons with factory-installed air conditioning.

relies upon a four-page letter submitted on November 17, 1978 by the United States Department of State to the Equal Employment Opportunity Commission ("EEOC"). The EEOC, which has submitted an amicus curiae brief here in opposition to Sumitomo's motion to dismiss,[9] had posed certain questions to the State Department. To one, "[d]oes the treaty permit subsidiaries of Japanese companies which are organized under the laws of a state of the United States to fill all its top management positions with Japanese nationals admitted as treaty traders,"[10] the State Department replied, in pertinent part:

The phrase "of their choice" should be interpreted to give effect to [the intention that United States companies operating in Japan could hire United States personnel for critical positions, and vice versa], and we therefore believe that Article VIII(1) permits U. S. subsidiaries of Japanese companies to fill all of their "executive personnel" positions with Japanese nationals admitted to this country as treaty traders. . . .

Letter from Lee R. Marks, Deputy Legal Adviser, Department of State, dated October 17, 1978, to Abner W. Sibal, General Counsel, EEOC.

The Ninth Circuit reversed the finding of antitrust violations and questioned the remedy imposed because the effect might be to discriminate against West German products in contravention of the German-American Treaty of 1954. Judge Bue has distinguished *Calnetics*, and this Court concurs in his analysis:

Read in a light most favorable to Itoh-America, *Calnetics* stands for the proposition that a United States incorporated subsidiary of a foreign corporation has standing to raise the claim that the Treaty rights of its parent may be affected by court ordered relief. . .
In *Calnetics* the Court of Appeals determined that the import ban ordered by the trial court might discriminate against the products of VW-Germany in contravention of that company's Treaty rights. By contrast . . .
Itoh-Japan [the parent company of Itoh-America] has no Article VIII(1) right to staff Itoh-America. Accordingly . . . even if Itoh-America has standing to invoke the Treaty rights of Itoh-Japan, it can claim no shield against application of Title VII to its own employment practices.

To another question, "[i]s the situation different if the company doing business in the United States is not incorporated in the United States," the State Department replied, in pertinent part:

[W]e see no grounds for distinguishing between subsidiaries incorporated in the United States owned and controlled by a Japanese company and those operating as unincorporated branches of a Japanese company, nor do we see any policy reason for making the applicability of Article VIII dependent on a choice of organizational form.

Sumitomo relies upon these statements to confirm its "preferential right and privilege to hire non-immigrant Japanese nationals" under the Treaty. The Court has carefully considered the State Department letter and is mindful of the Supreme Court's admonition in *Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1960), that "[w]hile courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight." *See also Factor v. Laubenheimer*, 290 U.S. 276, 295, 54 S.Ct. 191, 78 L.Ed. 315 (1933). However, in the absence of analysis or reasoning offered by the State Department in support of its position,[11] this Court does not find in the

*Spiess v. C. Itoh & Co. (America), Inc., supra,* 469 F.Supp. at 9.

9. The EEOC also filed an amicus brief in support of plaintiffs' motion to dismiss the counterclaims. *See* text *infra.*

10. *See* text *infra.*

11. It is disturbing that, in concluding that companies doing business and companies incorporated in the United States are to be treated equally under the Treaty, the State Department quotes only the first portion of the definitional section: "Article XXIII [sic] defines 'companies' as 'corporations, partnerships, companies and other associations, whether or not with limited liability and whether or not for pecuniary profit.'" The State Department neglects to quote the following sentence, which states that companies formed under the applicable laws of one of the parties are deemed companies thereof.

letter sufficiently persuasive authority to reject the Treaty's clear definition of corporate nationality and the consequent unambiguous meaning of Article VIII(1), or to reject established principles of corporate law and the precedents in the Fifth and Ninth Circuits.[12]

Sumitomo also contends that it retains Japanese identity by virtue of United States regulations and guidelines adopted in connection with Article I of the Treaty, which enables nationals of either the United States or Japan to enter the territories of the other and to remain therein for specified purposes. In connection with Article I of the Treaty, section 1101(a)(15) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101 et seq., provides:

> The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens . . ..
>
> . . . . .
>
> (E) an alien entitled to enter the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which he is a national . . ..

The Department of State has promulgated regulations that an alien must satisfy in order to obtain a treaty trader visa pursuant to section 1101(a)(15)(E)(i). Among these is that if the employer is not an individual, it "must be . . . an organization which is principally owned by a person or persons having the nationality of the Treaty country." 22 C.F.R. § 41.40 (1977). The parameters of this regulation are further described in 9 FOREIGN AFFAIRS MANUAL PART II, which states: "the nationality of the employing firm is determined by those persons who own more than 50% of the stock of the employing corporation regardless of the place of incorporation."[13]

Sumitomo seizes on the regulatory standard to urge that nationality for purposes of the Treaty should be determined by the State Department guidelines, explaining that it is by interaction with Article I that the Article VIII "freedom of choice" provision is implemented. As Sumitomo is a wholly owned subsidiary of a Japanese company, by this test Sumitomo also would be a Japanese company. The Court agrees with Judge Bue who, when presented with the same argument, found that "resort to the treaty trader guidelines to determine corporate nationality for purposes of interpretation of the Treaty provisions is unwarranted in the face of the clear definitional provisions included in Article XXII(3) of the Treaty itself." *Spiess v. C. Itoh & Co., supra,* 469 F.Supp. at 6.[14] The purpose of

---

12. Subsequent to the filing of the district court's Memorandum and Opinion in *Spiess v. C. Itoh & Co. (America), Inc., supra,* the opinion letter submitted by the Department of State to the EEOC was brought to the attention of that court, and a motion was filed requesting certification of the March 1, 1979 Order to the United States Court of Appeals for the Fifth Circuit pursuant to 28 U.S.C. § 1292(b).

Reconsidering his decision in light of the State Department letter, Judge Bue reaffirmed his holding that Itoh-America is a company of the United States under the terms of the Treaty and concluded that the opinion letter did not warrant reversal of the court's prior order. Nevertheless, certification was granted because [t]he Court concludes that the March 1 Order involves a controlling question of law as to which there are substantial grounds for difference of opinion and that an immediate appeal may materially advance the ultimate determination of this litigation.

*Spiess v. C. Itoh & Co. (America), Inc.,* 469 F.Supp. 9 (S.D.Tex. Apr. 10, 1979).

Accordingly, the following question was certified to the Fifth Circuit:

> Does the 1953 Treaty of Friendship, Commerce and Navigation between the United States and Japan provide American subsidiaries of Japanese corporations with the absolute right to hire managerial, professional or other specialized personnel of their choice, irrespective of American law proscribing racial discrimination in employment?

*Id.* at 10.

13. The Manual is distributed to all State Department consular offices and to the offices of District Directors of Immigration.

14. The State Department guidelines are promulgated for the purpose of determining an individual's immigration status; they are not designed for the purpose of defining a corporation's juridical status. Two decisions from this district lend support to this conclusion.

the Treaty is to assure that Japanese companies operating in the United States, and vice versa, will not be discriminated against in favor of domestic corporations. Sumitomo is a domestic corporation and as such has neither standing nor need to invoke the aegis of the Treaty. Accordingly, the motion to dismiss the discrimination claims on the basis of the Treaty is denied.

### The Section 1981 Claims

The second issue before the Court is whether the provisions of 42 U.S.C. section 1981 [15] apply to claims alleging discrimination based on sex and national origin. The law in this circuit, as in others, is clear that section 1981 does not apply to sex discrimination. *New York City Jaycees, Inc. v. United States Jaycees, Inc.*, 377 F.Supp. 481 (S.D.N.Y.1974), *rev'd on other grounds*, 512 F.2d 856 (2d Cir. 1975); *O'Connell v. Teachers College*, 63 F.R.D. 638 (S.D.N.Y.1974). *See also Vera v. Bethlehem Steel Corp.*, 448 F.Supp. 610 (M.D.Pa.1978); *Apodaca v. General Electric Co.*, 445 F.Supp. 821 (D.N.M.1978).

However, there is a split of authority among the courts which have considered the question whether claims of discrimination based on national origin are actionable under section 1981—a question, it appears, that the Second Circuit has not yet ad-

dressed. *Compare, e. g., Apodaca v. General Electric Company, supra; Vera v. Bethlehem Steel Corp., supra; Martinez v. Hazelton Research Animals, Inc.*, 430 F.Supp. 186 (D.Md.1977); *Budinsky v. Corning Glass Works*, 425 F.Supp. 786 (W.D.Pa.1977); *Kurylas v. United States Department of Agriculture*, 373 F.Supp. 1072 (D.D.C.1974), *aff'd*, 169 U.S.App.D.C. 58, 514 F.2d 894 (1975), *with LaFore v. Emblem Tape & Label Co.*, 448 F.Supp. 824 (D.Colo.1978); *Ortega v. Merit Insurance Co.*, 433 F.Supp. 135 (N.D.Ill.1977).

In *Jones v. United Gas Improvement Corp.*, 68 F.R.D. 1 (E.D.Pa.1975), the court reviewed carefully the legislative history of section 1981 and concluded that the section applies to discrimination based on race and alienage only. It then characterized the alleged discrimination against Spanish surnamed individuals as based on national origin and held that no action lay under section 1981. The court held

that the provisions of 42 U.S.C. § 1981 *are limited in their application to discrimination, the effect of which is to deny to any person within the jurisdiction of the United States any of the rights enumerated in that section, to the extent that such rights are enjoyed by white citizens of this nation. Discrimination on other grounds, such as religion, sex, or national*

In *Tokyo Sansei v. Esperdy*, 298 F.Supp. 945 (S.D.N.Y.1969), an action for review of the determination of the district director of the Immigration and Naturalization Service ("INS") was brought by individuals who had been denied treaty trader status. Their corporate employer, a wholly owned subsidiary of a Japanese corporation, joined in the action as a plaintiff. The district court upheld the administrative determination denying treaty trader status and noted that

> The question [whether the employer has standing] is substantial. It seems likely that without the individual plaintiffs, the corporation, however great its incidental "interest" as a business matter, could not maintain the suit. And with the individuals in the case, the corporation, strictly speaking, is unnecessary . . . .

*Id.* at 948 n.4.
Similarly, in *Nippon Express U.S.A., Inc. v. Esperdy*, 261 F.Supp. 561 (S.D.N.Y.1966), a subsidiary of a Japanese express company sought review of the denial by the INS district

director of an application made by the corporate employer on behalf of an alien employee for continuation of her status as a treaty trader. The district court concluded that

> [t]he Immigration and Naturalization Service has the responsibility for deciding [treaty trader status]. There is no merit to plaintiffs' contention that the Japanese employer itself may confer that status upon any employee it chooses.

*Id.* at 565.

**15.** Section 1981 provides:

> All persons with the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*origin, to which white citizens may be subject, as well as white non-citizens, non-white citizens, or non-white non-citizens, is not proscribed by the statute.* 68 F.R.D. at 15 (emphasis in original).[16]

■ A few courts have held that if national origin discrimination is motivated by or indistinguishable from racial discrimination, a claim will be actionable under section 1981.[17] However, even were this Court to find the *Jones* analysis unpersuasive, on the facts of the instant action it could not equate plaintiffs' claims that they have been discriminated against because they are *not* Japanese nationals with discrimination based on their race. Indeed, from a superficial perusal of the plaintiffs' names it appears that at least one of the plaintiffs is non-Caucasian. As plaintiffs have, and are exercising, an adequate remedy for redress under Title VII, there is no need for them to strain to fit their grievances into the mold of racial discrimination. The Court concludes that the plaintiffs' allegations of discrimination based on sex and national origin are insufficient to sustain a cause of action under section 1981 and that these claims should be dismissed.

### The Counterclaims

Plaintiffs cross-move pursuant to Rule 12(b) of the Federal Rules of Civil Procedure to dismiss Sumitomo's amended counterclaims for failure to state a claim upon which relief can be granted. Sumitomo counterclaims, first, for attorney's fees pursuant to 42 U.S.C. § 2000e–5(k) and punitive damages by reason of plaintiffs' "frivolous and spurious" institution of this lawsuit "in bad faith, vexatiously, willfully and wrongfully"; second, for damages by reason of plaintiffs' alleged abuse of the federal administrative and judicial process; third, for damages by reason of plaintiffs' common-law abuse of process; and fourth, for damages by reason of plaintiffs' tortious interference with Sumitomo's business operations.

For the reasons discussed below, the motion is granted as to the first counterclaim only. The remaining counterclaims, overlapping as Sumitomo's theories may be, satisfy the low threshold required to withstand a Rule 12(b) motion.

### I. Attorney's Fees

Sumitomo, predicating its first counterclaim on section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k), seeks recovery for attorney's fees expended to date and punitive damages for plaintiffs' wrongful conduct in commencing an allegedly spurious and frivolous Title VII action. Plaintiffs move to dismiss this counterclaim on the ground that section 706(k) will not support an independent claim for relief.

■ The question whether a defendant can request section 706(k) relief by way of counterclaim appears to be a novel one. The Court concludes that he cannot. Section 706(k) provides: "In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ." To treat this section as creating a separate cause of action is to ignore the words of the statute, which provide for reasonable attorney's fees

16. Although the Supreme Court has not yet considered whether an allegation of national origin discrimination may be actionable under section 1981, it has extended the protection of that provision to "racial discrimination in private employment against white persons." *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 287, 96 S.Ct. 2574, 2582, 49 L.Ed.2d 493 (1976).

17. A number of courts have permitted Hispanic individuals to sue under section 1981 upon evidence that the alleged discrimination was racial in character. *See Enriquez v. Honeywell, Inc.,* 431 F.Supp. 901 (W.D.Okl.1977); *Martinez v.*

*Hazelton Research Animals, Inc.,* 430 F.Supp. 186 (D.Md.1977); *Cubas v. Rapid American Corp., Inc.,* 420 F.Supp. 663 (E.D.Pa.1976). However, in *Budinsky v. Corning Glass Works,* 425 F.Supp. 786 (W.D.Pa.1977), an employee's allegation of discrimination based on his Slavic national origin failed to state a cause of action under section 1981. Similarly, an allegation of discrimination by a Polish-American failed to state a cause of action under this provision in *Kurylas v. United States Department of Agriculture,* 373 F.Supp. 1072 (D.D.C.1974), *aff'd,* 169 U.S.App.D.C. 58, 514 F.2d 894 (1975).

to the *"prevailing party,"* in the context of an existing action or proceeding *"as part of the costs"* thereof. This language necessarily implies a finality that this litigation does not yet approach. Accordingly, the first counterclaim is not yet justiciable and does not state a claim upon which relief can be granted. It will be stricken without prejudice to Sumitomo's right to make later application to the Court for reasonable attorney's fees if the Title VII action is found to be frivolous or without foundation.[18]

## II. Abuse of Process

■ The second and third counterclaims are based upon plaintiffs' alleged abuse of process in state and federal administrative and judicial proceedings. The gravamen of the tort of abuse of process is "misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish," Prosser, *Torts* § 121, at 856 (4th ed. 1971), or, stated in another way, the tortious use of "legal process to attain some collateral objective." *Board of Education v. Farmingdale Classroom Teachers*, 38 N.Y.2d 397, 402, 380 N.Y.S.2d 635, 641, 343 N.E.2d 278, 282 (1975). Sumitomo alleges that plaintiffs' purpose in bringing proceedings before administrative and judicial tribunals has been to coerce Sumitomo into acceding to their demands for work assignments for which they were unqualified and for payment of additional compensation to which they were not entitled. Such allegations clearly satisfy the intentional elements of the tort of abuse of process.

■ For purposes of a motion to dismiss, the court must accept the allegations of the complaint as true. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Hence Sumitomo is entitled to prove that the true intent of the plaintiffs was not legitimately to invoke the processes of the administrative agencies and the courts, but to coerce Sumitomo into yielding to their

demands for promotion and higher pay. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

## III. Prima Facie Tort

■ The intentional infliction of temporal damages without a legal motive—commonly referred to as prima facie tort—is a tort recognizable at law. *Smith v. Fidelity Mutual Life Insurance Co.*, 444 F.Supp. 594 (S.D.N.Y.1978); *Advance Music Corp. v. American Tobacco Co.*, 296 N.Y. 79, 70 N.E.2d 401 (1946). Its elements are: (1) the infliction of intentional harm (2) resulting in damages (3) without excuse or justification (4) by acts or series of acts that would otherwise be lawful. All must be established for the cause of action to be upheld. *Sommer v. Kaufman*, 59 A.D.2d 843, 399 N.Y.S.2d 7, 8 (1st Dep't 1977).

In *Board of Education v. Farmingdale Classroom Teachers, supra,* the Board of Education brought an action against a teachers association and its attorney for abusing legal process by subpoenaing, with intent to injure and harass the school district, 87 teachers to compel their appearances at an initial hearing before the public employees' relations board and refusing to stagger the appearances, so that the school district was forced to hire 77 substitutes. The New York Court of Appeals held that the complaint stated a cause of action for both abuse of process and prima facie tort. Discussing the prima facie tort claim, the court stated:

> The operative fact here is that defendants have utilized legal procedure to harass and oppress the plaintiff who suffered a grievance which should be cognizable at law. Consequently whenever there is an intentional infliction of economic damage, without excuse or justification, we will eschew formalism and recognize the existence of a cause of action.

18. In *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978), the Supreme Court defined the circumstances under which an attorney's fee should be awarded when the defendant is the prevailing party:

[A] plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.

38 N.Y.2d at 406, 380 N.Y.S.2d at 644, 343 N.E.2d at 284.

■ Sumitomo's fourth counterclaim alleges that by the institution of vexatious federal and state administrative and judicial proceedings and by disruptive and harassing activity in the office, plaintiffs deliberately and without justification inflicted temporal and economic harm upon Sumitomo. The Court concludes that this allegation satisfies the elements of prima facie tort and states a claim upon which relief can be granted.

### IV. Section 704(a)

■ Finally, both plaintiffs and the EEOC, as amicus curiae, assert that the counterclaims must be dismissed because the filing of charges before the EEOC and the bringing of a Title VII suit are absolutely privileged. As the basis for this theory, they cite section 704(a) of Title VII, which forbids "discrimination against . . employees for attempting to protest or correct allegedly discriminatory conditions of employment." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 796, 93 S.Ct. 1817, 1821, 36 L.Ed.2d 668 (1973).[19]

The Supreme Court has declined to resolve the issue whether "the protection afforded by § 704(a) extends only to the right of access [to the EEOC and federal courts] or well beyond it." *Emporium Capwell Co. v. Western Addition Community Org.*, 420 U.S. 50, 71 n.25, 95 S.Ct. 977, 989 n.25, 43 L.Ed.2d 12 (1975). However, the Court has stated that "[n]othing in Title VII compels an employer to absolve and rehire one who has engaged in . . . deliberate, unlawful activity against it." *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 803, 93 S.Ct. at 1825. In attempting to define the limits of protected conduct under section 704(a), lower courts have relied upon the *McDonnell Douglas* language to conclude that illegal activity and activity that unreasonably interferes with the employer's legitimate interests are not immunized by this provision. *See Novotny v. Great American Federal Savings and Loan Ass'n*, 584 F.2d 1235, 1261 (3d Cir. 1978); *Hochstadt v. Worcester Foundation*, 545 F.2d 222, 231 (1st Cir. 1976). In *EEOC v. Kallir, Philips, Ross, Inc.*, 401 F.Supp. 66, 71–72 (S.D.N.Y.1975), the court stated:

> Under some circumstances, an employee's conduct in gathering or attempting to gather evidence to support his charge may be so excessive and so deliberately calculated to inflicts needless economic hardship on the employer that the employee loses the protection of section 704(a), just as other legitimate civil rights activities lose the protection of section 704(a) when they progress to the point of deliberate and unlawful conduct against the employer.

The Court concludes that the cases cited above are dispositive of plaintiffs' contentions of immunity. Sumitomo alleges not only that plaintiffs instituted spurious administrative and judicial proceedings, but also that plaintiffs have been disruptive in the office, have endeavored to sabotage Sumitomo's business, have engaged in calculated acts of insubordination, have urged other employees to violate their fiduciary duties to Sumitomo and have harassed and coerced those who would not, and have attempted to "purloin" confidential corporate documents. Affidavit of J. Portis Hicks, sworn to July 11, 1978, ¶ 9. Allegations of such aggressive and hostile tactics, which must be accepted as true for purposes of a Rule 12(b) motion, cannot be dismissed on the basis of section 704(a).

Accordingly, plaintiffs' section 1981 claims and defendant's section 706(k) counterclaim for attorney's fees are dismissed. All other motions are denied.

So ordered.

---

**19.** 42 U.S.C. § 2000e–3(a). That section provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ˙ . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in. an investigation, proceeding, or hearing under this subchapter. ˙